# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| RONREGUS ARNOLD JORDAN, | :: | MOTION TO VACATE |
|     Movant, | :: | 28 U.S.C. § 2255 |
| | :: | |
| v. | :: | CRIMINAL NO. |
| | :: | 1:08-CR-0369-JOF-RGV-1 |
| UNITED STATES OF AMERICA, | :: | |
|     Respondent. | :: | CIVIL ACTION NO. |
| | :: | 1:12-CV-3221-JOF-RGV |

## FINAL REPORT AND RECOMMENDATION

On April 17, 2013, the undersigned Magistrate Judge conducted an evidentiary hearing on Ronregus Arnold Jordan's claim, raised in his 28 U.S.C. § 2255 motion, [Doc. 112], that he received ineffective assistance of counsel with respect to his right to testify. [Doc. 121]. Having considered the evidence presented and the parties' post hearing-briefs, [Docs. 122, 126-27], the undersigned finds that Jordan received effective assistance of counsel and **RECOMMENDS** that the Court **REJECT** this claim.

## I. PROCEDURAL HISTORY

After a mistrial by virtue of a hung jury, [Doc. 56], a second jury convicted Jordan of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1), and the Court sentenced him to 240 months of

imprisonment. [Docs. 75, 86]. W. Matthew Dodge of the Federal Public Defender Program, Inc. represented Jordan throughout these proceedings. [Docs. 6, 74, 84]. Jordan appealed, still represented by Dodge, and the Eleventh Circuit stated the "critical facts" as follows:

> . . . Officers Frederick Paige and Keith Backmon, field investigators for the Atlanta Police Department, were patrolling in an area known for narcotics sales when they saw the defendant Jordan walking down the middle of the street. Both officers wore plain clothes but exhibited their badges identifying themselves as police officers. Paige pulled his unmarked car over in a way that did not block Jordan's path. Jordan walked to the sidewalk and approached the police car on the passenger side. The officers told the defendant not to walk in the middle of the street, and he immediately became belligerent. Jordan yelled at the officers that he had not done anything wrong, and asked, "Why you all [f***] with me?"
>
> Officer Paige got out of his car to investigate further. As he approached Jordan, he noticed a gun-shaped bulge in the defendant's pocket. With that the officers moved to detain Jordan, but notably, before they could touch him, Jordan took off running. Officer Backmon pursued Jordan on foot, while Paige followed him in the patrol car. Paige, along with some other patrol units, caught up with the defendant, and Paige grabbed him. Paige wrestled with Jordan, who had the firearm in his hand. The officers ultimately wrestled the gun from the defendant, who was then arrested.

United States v. Jordan, 635 F.3d 1181, 1187 (11th Cir. 2011). Additionally, Jon Judkins, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, testified at Jordan's second trial that, during his transport to the U.S.

2

Marshals Service's custody, Jordan confessed to possessing the firearm. [Doc. 94 at 85, 89-94]. The defense's strategy was to argue that Jordan did not actually posses the gun and to imply that a police officer had planted the gun at the scene. [Doc. 95 at 60-62]. The defense also argued that Jordan's confession was false and made under duress. [Id. at 62-64]. On March 16, 2011, the Eleventh Circuit affirmed Jordan's conviction, Jordan, 635 F.3d at 1190, and on October 3, 2011, the Supreme Court denied Jordan's petition for a writ of certiorari, Jordan v. United Sates, 132 S. Ct. 356 (2011).

On September 14, 2012, Jordan timely filed the instant pro se § 2255 motion. [Doc. 112]. The District Court rejected all of Jordan's claims with the exception of his claim that Dodge provided him ineffective assistance with respect to his right to testify and referred this matter to the undersigned for an evidentiary hearing on the one remaining claim. [Doc. 115]. The evidentiary hearing was held on April 17, 2013, [Doc. 121], and the parties have submitted post-hearing briefs, [Docs. 122, 126-27].

**II. SUMMARY OF RELEVANT EVIDENTIARY HEARING TESTIMONY**

According to Jordan, he "tried to testify" in his first trial, but Dodge stated that he did not want Jordan to take the stand due to his criminal record, which Jordan asserted only included burglary and petty theft. [Doc. 121 at 5]. Jordan told counsel

3

that he did not "have any guns in [his] history" or anything "where [he] hurt somebody with a gun, so it didn't matter what was in [his] record." [Id.]. Dodge responded that he did not want Jordan "to get on the stand." [Id.].

Jordan explained that he wanted to testify because "the whole story that was used in the courtroom was concocted and it was not true at all." [Id. at 7]. Jordan maintained that he never spoke with the police because "as soon as [the officer] said, 'Mr. Jordan, come here,' [he] took off running." [Id.]. Jordan testified that because Dodge was unable to obtain any evidence to support Jordan's version of events, counsel decided to present a false defense that the police illegally detained Jordan before he fled. [Id.].

Jordan also denied telling Agent Judkins that he possessed a firearm. [Id. at 8-9]. Jordan testified that he told Dodge that he wanted to take the stand to contradict the agent because he was the only one who could. [Id. at 9]. Dodge responded that the jury "would never believe [him] over the agent . . . because [he is] the criminal." [Id.]. Dodge refused to put Jordan on the stand, and they "practically got into an argument in the courtroom" during the first trial. [Id. at 9-10].

Before his second trial, Jordan told Dodge that he still wanted to testify. [Id. at 10]. During that trial, the Court advised Jordan that he was presumed innocent and that

4

it was his decision whether to testify, but that "if I were you I would certainly listen to your lawyer." [Id. at 11]. Jordan "tried to testify even after those instructions . . . but Mr. Dodge still said, no, I'm not going to call you to the stand." [Id.]. Jordan never let the Court know that he wanted to testify because he "kind of felt defeated." [Id. at 12].

On cross-examination, Jordan testified that he had at least eight prior felony convictions and that three of those were "considered offenses involving violence." [Id. at 13]. Jordan met with Dodge "multiple times" before trial and discussed the government's evidence with him. [Id. at 15]. Dodge told Jordan "that it would be dangerous if the jury found out about [his] prior felony convictions." [Id. at 17]. Jordan replied that he "didn't care because [he] didn't have any guns in [his] history." [Id.]. Dodge told Jordan that he had the right to testify but counsel would not call him to the stand, and Dodge "never tried or made an attempt to prepare [him] to testify." [Id. at 18]. Jordan stated that, although he understood the Court's instruction regarding his right to testify, he did not "want to make an outburst in the Court and . . . make [him]self look like an idiot in front of the jury." [Id. at 19]. According to Jordan, Dodge refused to call him because his testimony would have contradicted the defense that counsel had presented. [Id. at 20]. Jordan "never once complained to the judge,"

5

told the judge that he wanted to testify, or asked the judge to appoint him a new attorney. [Id. at 20-21].

Dodge testified that he visited Jordan at the jail "every few weeks throughout [his] representation of [Jordan]" and at a more frequent pace as the trials approached. [Id. at 25]. Dodge "let [Jordan] know what choices were his, [including] . . . whether to testify at trial." [Id. at 28]. Dodge told Jordan that no one else could make those choices for him, not even counsel. [Id.].

Prior to both trials, the defense stipulated that Jordan was a convicted felon at the time of the alleged crime "in order to hide the list of and the types of felonies that . . . Jordan had on his criminal history from the jury." [Id. at 30, 35]. They discussed Jordan's potential testimony, and the risks Jordan faced if he testified included that his criminal history "would have been useful to a prosecutor impeaching [him]." [Id. at 31-32]. Dodge strongly advised Jordan not to testify. [Id. at 32].

Dodge's notes reflect that, during an October meeting at the jail prior to the first trial, "Jordan said unequivocally he did not want to testify." [Id. at 33]. "[D]uring the first trial, at the end of the government's case-in-chief," they again discussed whether to call Jordan as a witness, and Jordan "agreed with [counsel] that the best decision

6

would be not to testify and so he chose not to." [Id.]. Dodge "felt confident" when he announced that decision to the Court that it was Jordan's choice. [Id. at 34].

Dodge had no specific recollection of talking to Jordan regarding whether he should testify in the second trial. [Id. at 35]. Dodge expected that Jordan would not testify, and Jordan "had not said or done anything to make [Dodge] believe otherwise when the [second] trial began." [Id.]. However, Dodge testified that he was sure that they revisited the issue "after the government finished putting on its case" in the second trial and that Jordan "decided not to testify yet again." [Id. at 35-36]. At that time, Dodge strongly advised Jordan "that he would do himself more harm than good by testifying," but made clear that that was counsel's opinion and "continued to let [Jordan] know it's his choice." [Id. at 36]. Dodge "did not feel that [he] was forcing [Jordan] to do something that [Jordan] didn't want to otherwise do." [Id. at 37].

Dodge testified that the defense was the same at both trials, namely that Jordan's admission to the agent was false and that Jordan never possessed the firearm. [Id. at 36-37]. Jordan "made a story up to try to curry favor with the agent because . . . the agent promised him if you just confess you'll be okay, this will all go away, and . . . Jordan thought that would be the right thing to do." [Id. at 37]. According to Dodge, Jordan was concerned that the jury should hear his side of the story. [Id.].

7

At the close of the government's evidence in the second trial, the Court spoke directly to Jordan regarding his right to testify. [Id. at 38]. The Court advised Jordan that he was not required to testify and was presumed innocent, but that he could testify if he chose to do so. [Doc. 95 at 28]. The Court stated,

> . . . it doesn't matter what Mr. Dodge says. You have the right to testify, if you want to. Now, he's a good and experienced lawyer, and you certainly ought to listen to his advice. But in the final analysis, it's up to you.

[Id.]. Jordan confirmed that he understood. [Id.]. Jordan did not tell the Court that he wanted to testify or that Dodge was pressuring him not to testify. [Doc. 121 at 38]. "[D]uring the trial up to the verdict [Dodge] had no doubt that [Jordan's] decision not to testify was firm." [Id. at 39]. Dodge recalled arguing at sentencing that "Jordan simply asked for his day in court and sat quietly at the table and did not exacerbate his case by perjuring himself or testifying and losing." [Id. at 40-41].

On cross-examination, Dodge testified that, although he did not prepare a mock direct and cross examination of Jordan, he "did talk in general terms about what topics he would address on direct and what the general tenor of or what the general theme of the cross might be, but [he] did that very informally." [Id. at 42]. Dodge's notes reflect that, during his first meeting with Jordan on April 3, 2009, Jordan told counsel

8

that he had confessed to Agent Judkins. [Id. at 42-43]. However, there were times after that initial meeting when Jordan denied that he had confessed to Agent Judkins. [Id. at 43].

### III.  DISCUSSION

A criminal defendant has a fundamental constitutional right to testify in his own behalf at trial. Rock v. Arkansas, 483 U.S. 44, 51-53 (1987). This right cannot be waived by defense counsel. United States v. Teague, 953 F.2d 1525, 1532 (11th Cir. 1992) (en banc).

> Where the defendant claims a violation of his right to testify by defense counsel, the essence of the claim is that the action or inaction of the attorney deprived the defendant of the ability to choose whether or not to testify in his own behalf. In other words, by not protecting the defendant's right to testify, defense counsel's performance fell below the constitutional minimum, thereby violating the first prong of the Strickland[1] test. For example, if defense counsel refused to accept the defendant's decision to testify and would not call him to the stand, counsel would have acted unethically to prevent the defendant from exercising his fundamental constitutional right to testify.

Id. at 1534. For counsel to be effective, he "must advise the defendant (1) of his right to testify or not testify; (2) of the strategic implications of each choice; and (3) that it is ultimately for the defendant himself to decide whether to testify." McGriff v. Dep't

---

[1] Strickland v. Washington, 466 U.S. 668 (1984).

AO 72A
(Rev.8/82)

of Corr., 338 F.3d 1231, 1237 (11th Cir. 2003) (citation omitted). "[I]f counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the **strongest possible terms** not to testify." Teague, 953 F.2d at 1533 (emphasis added). "There are good tactical reasons why it may not be best for the defendant to testify in some circumstances[, including] if the defendant might be prejudiced by revelation of prior convictions." Id. at 1533, n.9.

    Having observed the demeanor of the witnesses, the Court does not find credible Jordan's testimony that Dodge refused to put him on the stand. Jordan's testimony was less credible, in part, because he never complained to the trial judge that Dodge was refusing to put him on the stand, even after the judge advised him that it was his decision to make, and because it is undisputed that Jordan made contradictory statements to counsel about whether he had confessed to Agent Judkins. On the other hand, Dodge offered credible testimony that he advised Jordan of his right to testify, warned him of the risks he faced if he elected to testify, and strongly advised him not to testify, but made clear that it was ultimately Jordan's choice to make. The Court also credits Dodge's testimony that he in no way forced Jordan not to testify and that Jordan made this decision freely and voluntarily after careful consideration. Dodge's adamant advice that Jordan not testify due to his criminal history, which included eight

10

felonies, was reasonable. Teague, 953 F.2d at 1533, n.9. Accordingly, Jordan has not shown that Dodge provided him ineffective assistance in connection with his fundamental constitutional right to testify.

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court **REJECT** Jordan's claim that he received ineffective assistance of counsel with respect to his right to testify.

**SO RECOMMENDED**, this 1st day of October, 2013.

*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE